**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA OWENS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| vs. | } | CASE NO. CV 05-B-2292-NE |
| | } | |
| EXPRESSJET, INC., | } | |
| | } | |
| Defendant. | } | |

**MEMORANDUM OPINION[1]**

This case is currently before the court on defendant Express Jet, Inc.'s ("Express Jet" or

Defendant") Motion for Summary Judgment. (Doc. 12.)[2]  Upon consideration of the record,

the submissions of the parties, the arguments of counsel, and the relevant law, the court is

of the opinion that the Motion is due to be granted.

**I.  FACTUAL SUMMARY[3]**

---

[1]  At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of Defendant.  The court requested that counsel for Defendant prepare a proposed memorandum opinion for the court and required that counsel send a copy of the proposed opinion to counsel for plaintiff.  The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n. 46 (11th Cir. 1997).  This is an important opinion.  Before requesting a proposed opinion from Defendants' counsel, the court had reached a firm decision as to the appropriate outcome.  Counsel drafted the opinion according to the express instructions of the court as to its contents.  These instructions were stated to Defendant's counsel, with Plaintiff's counsel present, following oral argument.  The court personally reviewed this opinion, and the opinion reflects the court's own conclusions.

[2]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[3]  As required when determining a Motion for Summary Judgment, the Statement of Facts reflects the facts in the light most favorable to Ms. Owens, the non-moving party.  All disputed

Plaintiff Melissa Owens (n/k/a "Melissa Owens Kratsch" and referred to herein as "Owens" or "Plaintiff") is a current employee of Defendant ExpressJet Airlines, Inc. ("ExpressJet" or "Defendant"). Owens filed this lawsuit on November 4, 2005, asserting a claim for sexual harassment and claims for retaliation and gender discrimination arising out of the failure to award her a supervisor position in Huntsville in January 2005. (Complaint, ¶¶ 6-19).

ExpressJet is a regional airline carrier. ExpressJet conducts flight and other service operations in airports across the United States, including in Huntsville, Alabama. *See* <www.expressjet.com>. Plaintiff, Melissa Owens, was hired by ExpressJet in December 2000 as a Customer Service Agent ("CSA") in the Huntsville station and is a current employee. (DX A, Owens Depo. at 11-12). For the last two years she has also worked as the training coordinator in Huntsville, helping train new employees on all job functions. (*Id.* at 21-22). This training usually takes from a day to a week. (*Id.*). Owens was interviewed and hired by the General Manager, Guy Simpson ("Simpson"). (Owens Depo. at 18). Simpson is still the General Manager for ExpressJet's Huntsville station. (*Id.*). Owens had no supervisory experience in the airline or any other industry when ExpressJet hired her, and, while employed at ExpressJet, has never participated in typical supervisory functions, such as hiring, discipline, or discharge. (Owens Depo. at 15, 176; DX B, Owens Resume).

---

facts are resolved in her favor and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 3188-89, 111 L. Ed. 2d 695 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

Owens testified that she likes her job and does not want to leave ExpressJet. (Owens Depo. at 44). Owens was offered a position at a local travel agency at the end of 2005, shortly after she filed this lawsuit, but turned it down voluntarily to continue working for ExpressJet. (*Id.* at 26-27).

In May 2003, ExpressJet added a supervisor position in the Huntsville station, reporting directly to Simpson. (DX C, Simpson Depo. at 89-91). Owens did not apply for the supervisor position, which was awarded to Laurie Healy, female, in May 2003. (Simpson Depo. 91). Healy was discharged in December 2004. (Owens Depo. at 68).

Owens applied for the supervisor position after Healy was discharged in January 2005, but was not awarded the job. (Owens Depo. at 174, 189). The job was awarded to Brad Conner, who, at the time, was an ExpressJet agent in Jackson, Mississippi, with prior airline supervisory experience. (DX D, Streeter Decl., ¶ 2).

Owens filed a Charge of Discrimination with the EEOC on or about March 3, 2005, alleging that she was subjected to and complained about sexual advances and harassment directed to her by a co-worker and was not awarded the supervisor position in January 2005 because of her gender and in retaliation for engaging in protected activity. (DX E, "Charge of Discrimination"). The EEOC was unable to establish a violation of Title VII and issued Owens a right to sue letter on August 1, 2005. (DX F, "Dismissal and Notice of Rights"). This lawsuit followed.

3

## A.      Claim 1:  Sexual Harassment

Owens alleges that she was subjected to sexual harassment by a fellow CSA, Rodney Russell, and Simpson.  (Complaint ¶¶ 18-19; Owens Depo. at 43).  ExpressJet maintains written EEO and harassment prevention policies.  (DX G, Owens Depo. Exs. 2-8).  These policies are published in the "Expressly Ours" handbook and the "Working Together Guidelines" and are available on-line to all employees.  (*Id.* at Exs. 3, 5, 6).  Owens signed an acknowledgment of receipt for the "Working Together Guidelines," (*id.* at Ex. 6), and was aware that "Expressly Ours" is published on-line and is available in the workplace.  (Owens Depo. at 51, 52).  The same policies were republished in substantially the same form in a January 2005 memo from the Vice President of Human Resources to all employees.  (DX G at Ex. 4).  Owens, along with all of the employees in Huntsville, received additional training on these policies in late 2004 during "With all Due Respect" training.  (*Id.* at 79).

ExpressJet's EEO and harassment policies require employees who witness or believe they have been a victim of discrimination or harassment to report it.  (DX G at Exs. 2-8). The reporting procedure is essentially a four step process beginning with confronting the alleged harasser, then reporting it to a manager or supervisor.  (*Id.*).  If the problem is still not resolved, an employee is instructed to report the conduct to Human Resources and if that does not stop the behavior, to make a report directly to the Vice President of Human Resources.  (*Id.*).

4

Owens was familiar with ExpressJet's reporting procedures and was aware of her obligation to tell management about any conduct she felt violated these policies.  (Owens Depo. at 59, 60, 73).  Employees, like Owens, may also talk to their local Employee Involvement Team Representative ("EIT Representative") and may refer to ExpressJet's Employee Assistance Plan with respect to any type of problem in the workplace.  (Owens Depo. at 42, 57).  The current EIT Representative in Huntsville is Owens's husband, Chris Kratsch.  (Depo. at 133).

Owens's sexual harassment claim is based on (i) two comments allegedly made to Owens -- one by Russell and the other by Simpson in Summer 2001, (ii) two hearsay comments allegedly made by Russell and Simpson about Owens to other employees in or before year 2003, and (iii) two or three incidents occurring before year 2003, in which a female employee allegedly sat on Simpson's lap and he touched one of the female employees' hair.  (Complaint ¶¶ 6-8; Owens Depo. at 43).

Specifically, Owens alleges that Russell called her a "trailer trash slut" in Summer 2001.  (Owens Depo. at 118).  This was the only time this alleged remark was ever made.  (*Id.* at 119).  Russell transferred to the Louisville station on July 1, 2003.  (*Id.*).  Russell has not called Owens and she has not seen him since he moved to Louisville in July 2003.  (Owens Depo. at 99).

Owens met with Simpson and Russell sometime in 2002 about the remark, and Russell allegedly told her "he [could] have her job.  All he's got to do is make a few phone calls to

Houston." (Owens Depo. at 91, 123-24). Owens describes this remark as threatening, although there is no evidence that Russell ever had any authority to terminate another employee's employment or that he called anyone in Houston with respect to Owens. (*Id.* at 123).

Simpson conducted an investigation into Owens's complaint but could not locate any employee who actually heard the exchange. (Simpson Depo. at 28). Russell also denied making the statement. (*Id.* at 29). Thus, unable to substantiate Owens's report, Simpson had Owens and Russell sit down and talk it out, after which he believed they had reached a mutual resolution. (*Id.* at 16). A station visit to Huntsville was also conducted in June 2002 and was attended by the Regional Director and the Human Resources Partner assigned to Huntsville at that time. (Streeter Decl., ¶ 4). During the visit, Owens reported Russell's alleged "trailer trash" remark and the subsequent remark about having her job. (*Id.*). Simpson was requested to issue Russell a letter of reprimand after the station visit, which he did. (Simpson Depo. at 17). Per policy, the letter remained in Russell's personnel file for eighteen months and was then removed. (DX H, Streeter Depo. at 11; DX I "Expressly Ours," p. 30 ). ExpressJet's Human Resources department received no similar complaints about Russell prior to the 2002 station visit and has received no similar complaints from other employees since then. (Streeter Decl., ¶ 4).

Owens also testified that people reported to her that Russell called her names behind her back. Even assuming these hearsay remarks occurred and are admissible, they had to

have occurred prior to July 2003 when Russell left the Huntsville station.  (Owens Depo. at 119).

Owens further complains that Simpson made a comment in her presence in Summer 2001 about women having "peanut butter legs."  (Owens Depo. at 128; Complaint ¶ 8).  Owens could not confirm whether the comment was directed towards her and did not remember how it came up in conversation.  (*Id.* at 129).  Owens claims that she also overheard Simpson use the phrase one other time to some male employees in 2003, but was certain that the comment was never again made to her.  (Owens Depo. at 131, 134).  (*Id.* at 207).  The above remarks (some of which are hearsay) are the only inappropriate comments which Owens testified were ever made (i) directly to her, or (ii) about her to other employees, by Russell or Simpson.  (Owens Depo. at 107-47).

Finally, in addition to the above remarks, Owens testified about three workplace incidents involving other employees which she claims were harassing to her.  For example, one time in 2002, she saw a female employee sitting in Simpson's lap, and heard that this occurred again shortly after Healy was hired in May 2003.  (Owens Depo. at 136, 138).  Owens did not know the circumstances of these two instances or if the female employees found the conduct harassing.  (*Id.*).  Likewise, she did not recall reporting the first such incident to Human Resources until later and never reported the second one to Human Resources or to anyone else, including her EIT Representative.  (*Id.* at 137-38, 140).

Also in 2002, Owens claims that she saw Simpson stroke a female employee's hair and rub her shoulders. (Owens Depo. at 145). Again, Owens did not know if the employee, Mandy Glenn, found this conduct inappropriate and could not remember reporting it to Human Resources until recently. (*Id.* at 146). It is undisputed that Glenn left ExpressJet in 2002. (Simpson Depo. at 109).

**B.      Claim 2:  Gender Discrimination and Retaliation**

Owens alleges that she was not awarded the supervisor position vacated by Healy in January 2005 because of her gender and in retaliation for engaging in protected activity, namely, complaining about discrimination and harassment. (Complaint ¶¶ 16-17). Owens retreated from these allegations in her deposition, stating that she does not actually believe the decision was "so much [because of her] gender," rather, she now thinks she "was being retaliated against." (Owens Depo. at 187). Owens's attorney represented during oral argument that Owens was not making a claim for gender discrimination for failure to promote.

After Healy's employment with ExpressJet ended in December 2004, the supervisor position was posted on or about January 3, 2005. (DX J, Morgan Decl., ¶ 3). The posting listed both job duties and qualifications. (*Id.*, Att. 1). The job duties of a supervisor include ensuring compliance with all company policy and procedures, employee discipline and counseling, preparing daily assignments, assisting the General Manager in all aspects of station operations, and substituting for the General Manager in his/her absence. (Morgan

Decl., Att. 1).  As far as qualifications, the Supervisor posting specifically listed "previous supervisory experience in a station environment is preferred." (Morgan Decl., Att. 1).  Other posted qualifications included management skills such as the "ability to effectively demonstrate leadership qualities" and "leadership/motivational communication skills." (*Id.*). There is no evidence that seniority has anything to do with the qualifications for the supervisor position or that it was a preferred requirement.  (Simpson Depo. at 70).

Five employees submitted resumes in response to the January 3, 2005, posting, including Owens. (Morgan Decl., ¶ 4 & Att. 2; DX K, Ward Decl., ¶ 3).  Two were male and three were female.  (*Id.*).

After submitting a resume, the next step in the hiring process is to conduct interviews of all the applicants. (Simpson Depo. at 77).  Because four of the candidates in this case were current employees, Simpson decided that the interviews should be conducted by an outside panel.  (*Id.* at 74, 82, 87).  When a panel is used, the panel typically recommends one or more candidates to the General Manager.  (Simpson Depo. at 80).  If more than one candidate is recommended, Simpson can schedule another round of interviews or choose between the candidates.  (*Id.*).  Simpson will only offer the position to candidates recommended by the panel.  (*Id.* at 70, 77, 80).

At Simpson's request, the five candidates were interviewed in Huntsville by Rose Morgan, Manager Airport Services Training (Houston-based), and Ted Ward, General Manager of the Louisville, Kentucky station.  (Morgan Decl.,  ¶ 5; Ward Decl., ¶ 1).

9

Simpson did not conduct any of these interviews and did not discuss the candidates with Morgan or Ward.  (Simpson Depo. at 69, 70, 71, 75, 81, 82, 88).

As outside interviewers, Morgan and Ward had access only to the candidates' resumes.  (Morgan Decl., ¶¶ 5, 13; Ward Decl., ¶¶ 5, 10).  There is no evidence that either Ward or Morgan was aware that Owens had made any complaints about discrimination or harassment in the workplace or otherwise engaged in any sort of protected activity.  (*Id.*).  Nor did Owens ever tell Morgan or Ward that she had complained about Simpson or previously engaged in alleged protected activity during the interview.  (Owens Depo. at 182).

Owens contends that during the interview she was asked about her loyalty to Simpson and whether she thought Healy had done a good job as supervisor, which she thought was inappropriate.  (Owens Depo. at 182-83, 185, 187).  The written job description states that one of the supervisor's job duties is to assist the General Manager in the operation and administration of the station.  (*Id.*).

After the interviews, Morgan and Ward advised Simpson that they did not interview anyone they would recommend for the position, male or female.  (Morgan Decl., ¶ 7; Ward Decl., ¶ 7; Simpson Depo. at 69, 81, 88).  Simpson did not ask Morgan or Ward why anyone from the first panel was not recommended, and proceeded to re-post the position.  (Simpson Depo. at 69, 81; Morgan Decl., ¶ 8 & Att. 3; Ward Decl. ¶ 8).

Three individuals submitted resumes in the second round of interviews, including Owens's husband, along with another Huntsville CSA (male), and the eventually successful

10

candidate, Brad Conner (male).  (Morgan Decl., ¶ 10 & Att. 4; Ward Decl., ¶ 8).  Again, as outside interviewers, Morgan and Ward had access only to the candidates' on-line resumes.  (Morgan Decl., ¶¶ 5, 13; Ward Decl., ¶¶ 5, 10).  Morgan and Ward recommended Conner as the most qualified applicant based on his performance in the interview and his qualifications, including several years of experience in the airline industry and two years of prior airline supervisory experience.  (Morgan Decl., ¶ 15 & Att. 6; Ward Decl., ¶ 11).  They did not recommend any other candidates.  (*Id.*).  Simpson offered the position to Conner based on Morgan's and Ward's recommendation.  (Simpson Depo. at 81, 89).

Owens believes that she was more qualified than Conner because she had to help Conner on the ticket counter during his first week on the job.  (Owens Depo. at 186, 197, 201).  She also described Conner's hiring as "fishy" because he had only been with ExpressJet for six months.  (*Id.* at 187).

As of November 2005, when Owens filed this lawsuit, ExpressJet employed eighty-five (85) airport supervisors.  (Streeter Decl., ¶ 6).  Of these, forty-four (44) were female and forty-one (41) were male.  (*Id.*).

## II. STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Celotex,* 477 U.S. at 322-23.

Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show either by affidavits, depositions, or discovery responses on file that there exist "specific facts showing that there is a genuine issue for trial," *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial, however he may not merely rest on his pleadings.  *Id.*  "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Clark*, 929 F.2d at 608.  After a properly made motion has been presented and the court has allowed appropriate responses to be submitted, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).

## III.  DISCUSSION

**A.      Owens's harassment claim is time-barred under Title VII**

In Alabama, a non-deferral state, 42 U.S.C. § 2000e-5(e)(1) instructs that a charging party must file an EEOC charge within 180 days of the alleged unlawful employment practice.  *Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005), *cert. granted*, 126 S. Ct. 2695 (2006).  Owens's charge was filed on March 3, 2005. Therefore, the last act of discrimination must have occurred on or before September 3, 2004, to be timely.

All of the allegedly harassing remarks and incidents alleged by Owens occurred, by her own admission, between 2001 and 2003, well outside the 180-day filing period mandated by Title VII.  Because Owens has failed to allege any actionable conduct occurring within the statutory limitations period, her sexual harassment claim will be dismissed as a matter of law.  *See Thomas v. Alabama Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1117 (M.D. Ala. 2003) (granting summary judgment on hostile environment claim, holding that claims of racially hostile work environment arising out of vulgar and abusive language directed to plaintiff were untimely because all of the incidents identified by plaintiff occurred outside the 180-day administrative filing period); *Grandquest v. Mobile Pulley & Machine Works, Inc.*, 163 F. Supp.2d 1338, 1344 (S.D. Ala. 2001) (granting summary judgment, sexual harassment claim time-barred where plaintiff admitted that all of the allegedly

harassing remarks made by her co-worker occurred more than 180 days before she filed a charge).

**B.   Owens presented insufficient evidence of a hostile environment**

Even if Owens's harassment claim was timely, "Title VII does not make employers always automatically liable for sexual harassment by their supervisors." *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998) (internal citations omitted).  Owens is proceeding under a hostile work environment theory.  (Complaint ¶¶ 18-19).  Under a hostile work environment theory, for sexual harassment to violate Title VII, it must be sufficiently severe and pervasive to effectively result in a change in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned.  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004); *see also Harris*, 510 U.S. at 21 (recognizing that workplace must be "permeated" with discriminatory intimidation, ridicule and insult).

Because "Title VII is not a federal 'civility code,'" the alleged conduct must meet a "minimum level of severity or pervasiveness" before it is actionable.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245-46 (11th Cir. 1999).  The test for determining whether conduct experienced by an employee is sufficiently severe or pervasive incorporates both a subjective and objective component.  *Id.* at 1246.

Subjectively, the employee must perceive the harassing conduct she allegedly experienced as being sufficiently severe or pervasive to alter the terms or conditions of

employment.  *Id.*  A failure to complain or significant delay in complaining is evidence a plaintiff did not subjectively perceive the conduct to be offensive.  *Hanes v. Mobile Infirmary Med. Ctr.*, 2005 WL 1840236, *10 (S.D. Ala. Aug. 2, 2005).  Here, although Owens eventually reported Simpson's and Russell's alleged remarks internally, she waited years to file a charge with the EEOC.  She also failed to complain to Human Resources at the time of the alleged "lap-sitting" and "hair-touching" incidents, despite acknowledging her obligation to do so if she thought the conduct toward those other employees violated policy. Finally, Owens's subjective belief as to the severity and pervasiveness of all of these alleged remarks and incidents is severely diminished in light of her own testimony that she chose to continue working at ExpressJet under Simpson's supervision, even turning down another job offer shortly after this lawsuit was filed.

An employee's subjective perception of the conduct she experiences as offensive must also be objectively reasonable, considering all of the circumstances and being judged from the perspective of a reasonable person in the plaintiff's position.  *Mendoza*, 195 F.3d at 1246 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).  The objective component analysis involves consideration of four factors:  (1) the conduct's frequency; (2) the conduct's severity; (3) whether the conduct is physically threatening or physically humiliating; and (4) whether the conduct unreasonably interferes with the employee's job performance.  *Id.*  Owens's testimony falls well-short of this exacting standard.

15

The remarks and workplace incidents alleged by Owens were infrequent and remote in time, occurring, by Owens's own admission, between 2001 and 2003.  There is no evidence that any of these remarks or incidents were physically threatening or physically humiliating.  Nor is there any evidence that any of these incidents affected Owens's ability to perform her job or altered any aspect of her own terms and conditions of employment.  *See Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) ("A mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.").  In fact, other than the verbal remarks by Simpson and Russell, most of which were hearsay, the remaining workplace incidents described by Owens which she either witnessed or heard about were minor in nature and directed exclusively to other employees.  *See Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994) (plaintiff failed to demonstrate that defendant's use of vulgar language directed toward other female employees altered her own conditions of employment); *see also See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 760 (8th Cir. 2004) (affirming summary judgment where racial slurs were directed at third parties, not plaintiff, and many of the comments were merely overheard by plaintiff); *Turner v. Honeywell*, 54 Fed. Appx. 236, 239 (7th Cir. 2002) ("Given the totality of the circumstances, second-hand reports that racial slurs were overheard in the workplace are insufficient in this case to support a harassment claim.").  As a matter of law, the conduct alleged by Owens fails to rise to the level of actionable harassment.

The Eleventh Circuit has rejected numerous hostile work environment claims at the summary judgment stage involving much more than three comments and hearsay remarks made over a five year period and a handful of minor, isolated incidents involving other employees, on the grounds the conduct was not sufficiently severe and pervasive to be actionable under Title VII. *See Gupta v. Fla. Bd. Of Regents,* 212 F.3d 571, 582-85 (11th Cir. 2000) (no actionable harassment shown by evidence alleged harasser looked plaintiff up and down, frequently called her at home at night, asked about her boyfriend, asked her if she was in bed, frequently asked her to lunch, stared at her legs, touched the inside of her thigh, lifted the hem of her dress, unzipped his pants in front of her to tuck in his shirt, offered to spend the night with her during a storm, told her "I can tell you are innocent and you don't have much experience," and told her "women are like meat" and "men need variety in women."); *Herron v. Morton*, 255 Fed. Appx. 423, 426-27 (incidents where supervisor touched an employee once on the thigh and asked if she would have a better attitude, "star[ed] at a female employee during a training session," and "stared at [five other employees] in a manner that made them feel uncomfortable" did not constitute sexual harassment"); *see also Bussell v. Motorola, Inc.*, 141 Fed. Appx. 819, 822-231 (11th Cir. 2005) (*per curiam*) (no actionable harassment by "vulgar" co-worker who would "constantly … walk behind [plaintiffs'] desk and rub his crotch against [her] back as he walked by, as if there was not enough room to get through" and who also "bragged [to plaintiff and other coworkers] about cheating on his wife and frequenting strip clubs," "made demeaning comments about

17

women," suggested to plaintiff her "hair grew so fast . . . because she was sexually active," commented to plaintiff she should not be with her younger boyfriend when she "'could have a man' like him" and once pulled up plaintiff's shirt and pulled down her pants while commenting "nice tattoo"); *Mendoza*, 195 F.3d at 1247-48 (no actionable harassment shown by evidence supervisor "constantly" looked plaintiff "up and down," twice looked at her groin and made a sniffing motion, once rubbed his hip against hers and touched her shoulder while smiling, and once responded to her by saying "Yeah, I'm getting fired up, too").

Because there is insufficient evidence to show a genuine issue of material fact on whether Owens experienced an actionable hostile work environment, her sexual harassment claim will be dismissed as a matter of law.

**C.**    **Owens presented insufficient evidence of retaliation**

**1.**    ***Owens cannot establish a* prima facie *case of retaliation.***

It is well-established in the Eleventh Circuit that to successfully allege a *prima facie* retaliation claim under Title VII, the plaintiff must show: (1) that she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and the protected expression. *Bonner v. Home Depot*, 323 F. Supp. 2d 1250, 1263 (S.D. Ala. 2004), *aff'd*, 125 Fed. Appx. 982 (11th Cir. 2004). Assuming Owens engaged in protected activity by making reports about Russell's and Simpson's alleged remarks, there is no evidence that these reports were causally related to the failure to recommend her for the supervisor position.

To prove a causal connection, the Eleventh Circuit has stated that "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Clover v. Total Sys. Servs.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *see also Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("In order to satisfy the 'causal link' prong of a *prima facie* retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action. Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action.") (citations omitted).

Assuming that Owens engaged in any protected activity, there is no evidence that Morgan or Ward was aware of this conduct when they recommended Conner for the supervisor job. It is undisputed that Morgan and Ward, not Simpson, conducted the interviews for the supervisor position in Huntsville. At most, the summary judgment evidence reveals that Simpson had the discretion to choose among the candidate(s) recommended by the outside interviewers; however, in this case, the only candidate that Morgan and Ward recommended was Conner. (Morgan Decl., ¶ 7; Ward Decl., ¶ 7).

It is also undisputed that neither Ward nor Morgan had access to anything other than Owens's on-line resume during the interview process, which contains no mention of anything

resembling protected conduct.  (Morgan Decl., ¶¶ 5, 13; Ward Decl., ¶ 5).  Owens further testified that she did not mention any prior complaints to management during the course of the interview itself. (Owens Depo. at 182).  Finally, there is no evidence that Simpson talked to Morgan or Ward about the interviewees, much less disclosed any prior complaints Owens may have made about events occurring several years prior.  In sum, there is insufficient evidence, indeed no evidence, that Morgan or Ward was aware of any protected conduct on Owens's part to sustain a retaliation claim.   As a matter of law, Owens has failed to make out a *prima facie* case of retaliation.

### 2. *Owens presented insufficient evidence of pretext.*

Once a *prima facie* case has been established, the employer has the burden of articulating a legitimate non-discriminatory reason for the challenged employment decision. The plaintiff must then demonstrate that she will be able to establish at trial that the employer's proffered non-discriminatory reason is a pretextual ruse for retaliation.  *Farley v. Nationwide Mutual Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

Assuming Owens could establish a *prima facie* case, there is insufficient evidence of a pretext for retaliation.  At most, other than Owens's subjective belief about her own job performance, which, as a matter of law is insufficient to carry her summary judgment burden, Owens claims that she must have been retaliated against because she was more qualified than Conner inasmuch as she "was with the company longer and the fact that [she] had to train him when he came in."  (Owens Depo. at 195).

20

There is no evidence that seniority or time with the company was a consideration in filling the supervisor job; in fact, Simpson undisputedly testified that it did not. (Simpson Depo. at 70). Nor could a reasonable juror conclude that because Owens familiarized Conner with the local ticket counter in Huntsville during his first week on the job, as she did with all new employees, that she was more qualified to supervise the station. *See Chambers v. Metropolitan Prop. & Cas. Ins. Co.*, 351 F.3d 848, 857-58 (8th Cir. 2003) (affirming summary judgment, concluding that while plaintiff's analytical skills may have been stronger, candidate chosen had special expertise in market in which employer was very interested); *see also Young v. General Foods*, 840 F.2d 825, 830 (11th Cir. 1988) (employee's own opinion that his job performance was satisfactory was insufficient to create issue of fact where employer submits evidence to the contrary).

The Eleventh Circuit has stated that with respect to qualifications of candidates, the burden is on the plaintiff to establish that he or she was substantially more qualified than the person promoted. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). Substantially more qualified should be understood to mean that disparities in qualifications must be "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Ash v. Tyson Foods, Inc.,* 2006 WL 2219749, *3 (11th Cir. August 2, 2006); *Cooper v. Southern Co.,* 390 F.3d 695, 732 (11th Cir. 2004); *Alexander v. Fulton County*, 207

F.3d 1303, 1340 (11th Cir. 2000).  Applying this standard, Owens has failed to raise a genuine issue of material fact demonstrating that she was substantially more qualified than Conner.

Conner, who had been a CSA in ExpressJet's Jackson, Mississippi station since May 2004 (almost a year), had almost seven years of prior airline experience with Delta and GAT Airline Ground Support before working for ExpressJet.  (Morgan Decl., Att. 6).  In his position at GAT, Conner was a Ramp Supervisor and had management responsibility – a preferred job requirement --  including overseeing employees, scheduling, and budget in connection with ramp duties to be accomplished for Delta, Alaska Airlines, Comair, and Skywest.  (*Id.*).  Owens, on the other hand, had approximately five years experience (four of which were part-time) in the airline industry and no supervisory or management experience at all.  (Morgan Decl., ¶ 17, Att. 5; Owens Depo. at 11, 12, 15).

ExpressJet is legally entitled to exercise its independent discretion in weighing each candidate's qualifications and, in this case, there is evidence on which a reasonable jury could find that it did not legitimately exercise that discretion and recommend the most qualified candidate to fill the supervisor position, based on the written qualifications for the job.  *Lee*, 226 F.3d at 1249 (affirming summary judgment, concluding that where candidate selected was undisputedly more qualified on three of four criterion, plaintiff failed to create genuine issue of material fact on pretext); *see also Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.") (citing cases).

Thus, even assuming Owens could establish a *prima facie* case of retaliation, she has failed to raise any genuine issue of material fact on the question of pretext and therefore her retaliation claim will be dismissed as a matter of law.

## IV. CONCLUSION

Based on the forgoing, the court is of the opinion that Defendant's Motion for Summary Judgment (doc. 12) is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the 28th day of September, 2007.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

23